Affirming.
B.J. Treacy recovered of R.J. Talbott the sum of $570.00 as real estate brokerage commissions earned on the sale of a tract of land in Woodford county. Talbott appeals.
Appellee has a real estate agency in the city of Lexington and employs W.G. Jackson in that business. R.J. Talbott formerly owned a farm in Woodford county which he sold to Mrs. Elizabeth Maury of San Antonio, Texas, on the 3rd of November, 1922, the deed being made to Mrs. Maury's son, Capt. Lewis Maury.
Appellee testifies that in October, 1922, he received a letter from Capt. Lewis Maury, who was then in Denver, inquiring for a bluegrass farm. That on October 23, Capt. Maury came to his office in Lexington and he introduced him to his employe, Mr. Jackson. His firm had a number of farms listed for sale and the descriptions and prices of each endorsed on a card and indexed. Mr. Jackson and Capt. Maury went over these and Capt Maury noted on a memorandum pad such of the farms as interested him.
Mr. Jackson testifies that in January, 1922, Mr. Talbott requested him to find a purchaser for his farm at the price of $325.00 per acre, and in pursuance of this request he filled out a card showing the number of acres, improvements, character of land, crops raised, c., and filed this card with his employer, B.J. Treacy, and that Talbott renewed this request in April; that at the time stated by Mr. Treacy, Capt. Maury indicated to him that *Page 10 
he wanted a farm with woodland on it, with a two-story brick house, and selected four or five farms to inspect. Witness got in his machine and drove Capt. Maury and his mother out to inspect these farms. The Talbott farm was the second one visited. Mrs. Maury objected to it on account of its having a frame residence, but he insisted upon them seeing it calling their attention to the fact that there was a woodland in front. When they reached the residence he got out of the machine and found Mr. Talbott and said to him, "I have got this live customer that I have been trying to find for you. I have a live one and I want to show him your farm. Is your farm still for sale? He said 'Yes,' and I said come down and see these people and show them this farm. This is an army officer and his mother from Wyoming and I think your farm will about suit them." They went down to the auto and he introduced Mr. Talbott to Captain Maury and his mother. A horse and buggy were hitched to the barn and Mr. Talbott and Capt. Maury got in the buggy and drove over the farm. He was invited to accompany them, but there was not room in the seat to ride in comfort. Before leaving Talbott priced the property at $300.00 per acre. Capt Maury indicated that he might want to see the farm again and Talbott said, "Well, have Jackson to bring you out. He says, he will bring you out any time you want to." They visited other farms and returned to Lexington that afternoon. On the following day Jackson took them out to inspect a number of other farms in Woodford, Scott and Franklin counties. Mrs. Maury was impressed with a certain farm and asked Jaskson's advice in reference to it. He advised her that in his opinion the Talbott farm was nearer worth the money asked than any other that they had visited, and gave the reasons for his opinion. On their return to Lexington Mrs. Maury suggested that they would rest on the 25th and then go to Bardstown, but would see him when they came back in about ten days. Neither Treacy nor Jackson saw the parties again until after the sale.
The appellant denies that he listed the property with Jackson for sale; states that he was unacquainted with the Maurys, but had received information that a lady from Texas wanted to buy his farm and was coming out to see it and had his horse hitched for the purpose of showing it to her; that upon the arrival of the automobile he at first thought Jackson was the chauffeur for the parties, as he stayed in the machine and Capt. Maury *Page 11 
introduced himself. Later he recognized Jackson and invited him to go with them to look at the farm. Jackson declined and did not manifest any interest in the matter and he did not consider him in the light of an agent. The farm contained 132 acres and he priced it to Capt. Maury at $40,000.00, but the parties said nothing about coming back; that on the second day following they came back in their own machine and stayed about an hour and a half or two hours, viewing the place, but made no offer. Two days later they returned again, but did not offer to purchase the farm and he took them to visit another farm. The Elmore farm near his place was to be sold at auction on November 3, and at his invitation Capt. Maury attended that sale. The auctioneer, Bolivar Bond, was a real estate agent of Versailles. Witness met Bond on the ground before the sale and engaged his services: "I told Mr. Bond I had some people here I had been dickering with about selling my farm and I could not close up with them and I think you can. And he said, 'All right, I will meet them after the sale.' " After the sale witness introduced Mr. Bond to Capt. Maury and Mrs. Maury and he succeeded in making a sale to them, for $38,000.00, a contract being signed at that time by which Mrs. Maury purchased the land for her son.
Capt. Maury admits that he and Mr. Jackson went over the card indexes in Treacy's office and that he made memoranda of the farms with which he was impressed and that Mr. Jackson came in his auto and drove them around for two or three days; that he told him that he was going to Bardstown, although he did not go. No other real estate agent except Jackson went with him on the Talbott farm; however he had heard of this farm otherwise and that he drove over it with Mr. Talbott when Jackson was not present.
Mrs. Maury testifies that she purchased the farm for her son; that they had heard of it through S.D. Mitchell; at the time that Mr. Mitchel spoke to them about it she had an engagement to go with Mr. Jackson. On the trip, in passing the Talbott farm, she called her son's attention to it, saying, it must be the one Mr. Mitchell spoke of, though she does not know that Mr. Jackson heard her; from Texas wanted to buy his farm and was coming out to see it and had his horse hitched for the purpose of look at it. Her son got out and stayed a short time, but she did not get out of the car. They then proceeded to the farm that Mr. Jackson wanted to show them. It did *Page 12 
not suit and they so informed Mr. Jackson. The next day she and her son drove out to see the Talbott farm and after negotiations for about ten days she purchased it, part of the negotiations being conducted by Mr. Bolivar Bond, but that she never had any conversation with Mr. Jackson as agent for Talbott. S.D. Mitchell testifies that he informed Captain Maury that the Talbott farm was for sale, but that he is not a real estate agent. W.H. Railey, a real estate agent of Versailles, testifies that the defendant came to his office and told him of having a prospect for the purchase of his farm; that Bill Jackson, a farm agent over in Lexington, had brought him out there, but that he did not go over the farm and show it to the prospect. D.D. Smith testifies that Jackson brought Captain Maury and his mother to see his place in Scott county; that they informed him that they were going to look at some farms on the road to Bardstown.
Bolivar Bond agrees with appellant as to what took place between them. He knew of no other real estate agent being interested and charged his regular commission of 2%.
On this evidence the defendant offered the following instructions, which the court refused:
 (3) "The jury will find for the defendant, unless they believe from the evidence that the plaintiff sold for defendant his property in the proof described, or was the procuring cause of the making of the contract between defendant and Mrs. E.S. Maury, for the sale of said property.
 (4) "The jury are instructed that if they believe, from the evidence that the property of they defendant in the proof described was listed with or in the hands of plaintiff as real estate agent for sale, and while so in his hands, was in the hands of another real estate agent for sale, and that a real estate agent, other than plaintiff, succeeded in bringing the defendant and the purchaser together and induced them to enter into the contract in the proof described, then the jury shall find for the defendant."
On his own motion the court gave the following instruction:
 (1) "If the jury believe from the evidence that the defendant entered into a contract with the plaintiff *Page 13 
or with his agent, whereby the plaintiff was authorized to sell the defendant's farm, and if they further believe from the evidence that the plaintiff or his agent did bring to the defendant a purchaser for said farm, and as a result of the bringing of the purchaser and the defendant together, the defendant was induced to purchase said farm, then the jury will find for the plaintiff, and unless the jury do so believe they will find for the defendant."
The court's action in each instance is criticised. It may be said that instruction No. 4 as offered is a correct exposition of the law applicable to rival claimants for commissions on the sale of property that has been severally listed with each. Kice v. Dugan, 143 Ky. 676; Hopkins v. Mosely, 105 S.W. 104, 31 L. R. 1308; Hume v. Dunn, 166 Ky. 76; Higgins v. Miller, 109 Ky. 259.
But the facts in this case do not fall within that principle. Here, according to the evidence, the property was listed with appellee for sale. He found a prospective purchaser; his employe, Jackson, carried this party to appellant's home, informed appellant of the situation and introduced him to the purchaser; appellant then showed and priced the property to the purchaser and requested that he come again with Jackson, who, while carrying the parties to inspect other farms, advised them to purchase this one, and parted with them on the evening of the 25th of October, with the understanding that they were leaving for a short visit, but would see him on their return, and the matter stood thus until appellee was informed of the sale on November 3rd. Appellant contradicts the facts as claimed by appellee except he admits that Jackson accompanied Maury to his home and introduced them; that the negotiations continued until a sale was consummated on November 3rd, his theory being that appellee did not act as his broker, consequently there is no pretense of a withdrawal on his part, or of any abandonment of the negotiations from the time he met Maury until the deal was consummated.
The property was not listed with Bond for sale in the sense that term is generally used. He was not employed to find or procure a purchaser; he did not bring the parties together, nor was he expected to do so, for both parties were already advised as to all essential particulars entering into the bargain and appellant employed him to clinch the negotiations. This was legitimate employment *Page 14 
and constituted Bond an agent of appellant, but did not make him a rival of appellee or conflict with his claims, if the facts were as claimed by the latter. Under the circumstances, appellee's right to recover commissions stands on the same footing as if the deal had been closed by Talbott himself, and Bond's participation may be eliminated from a consideration of the case, and when this is done it is clearly perceived that instruction No. 4 is not applicable.
In contests between the owner and broker we have said:
 "The true doctrine we take to be this: The broker undertakes to furnish a purchaser, and is bound to act in good faith in presenting a person as such, and when one is presented the employer is not bound to accept him or to pay the commission, unless he is ready and able to perform the contract on his part according to the terms proposed; but if the principal accepts him, either upon the terms previously proposed or upon modified terms then agreed upon, and a valid contract is entered into between the principal and the person presented by the broker, the commission is earned." Coleman's Exor. v. Meade, 13 Bush 358. See also Stedman, c. v. Richardson, c., 100 Ky. 79; McDowell v. Lewis, 200 Ky. 126; Ferguson v. Harris, c., 200 Ky. 146; Futrell v. Reeves, 165 Ky. 282.
 "We think that where the owner of property puts it in the hands of a real estate agent for sale, and the agent finds a purchaser, but the contemplated purchaser and owner cannot agree on terms, and the owner, with a view of avoiding the agent's commission, withdraws the property from the hands of the agent without his consent and breaks off the negotiations with the purchaser, but thereafter sells the property to the purchaser brought to his attention by the agent, or to a third person who he knows is acting for him, the agent should be treated as the procuring cause of the sale and entitled to his commission. . . . In Vreeland v. Verterlein, 33 N.J. Law 247; Plant v. Thompson, 42 Kan. 664; Hoadley v. Savings Bank, 71 Conn. 599; Branch v. Moore, 105 S.W. 1178; Henninger v. Burch, 90 Minn. 43; Coleman v. Meade, 13 Bush 358; Stedman Bowman v. Richardson, 100 Ky. 79, and in many other cases, *Page 15 
the general rule is announced that where the real estate broker brings the parties together and is the procuring cause of the sale, he may recover his commissions, although the sale may in fact be made directly by the owner to the purchaser brought to his attention by the real estate broker." Tracy v. Gilman, 161 Ky. 513.
Instruction No. 1 as given by the court submits the issues of fact in the case and conforms to the legal principles laid down in the cases, supra. Instruction No. 3 offered by appellant also is correct as an abstract proposition of law, but under the facts of this case it may have confused the jury and provoked a discussion as to whether appellant or Bond was the procuring cause of the sale; as we have seen that Bond's participation should have been eliminated, it follows that the court did not err in giving instruction No. 1 and in refusing to give No. 3 as offered by appellant.
Wherefore, perceiving no error, the judgment is affirmed.